SENT ON JULY 2, 2021 VIA EMAIL
FOR FILING IN COURT

FILED

JUL 02 2021

JILL E. WHELCHEL
WHITMAN COUNTY CLERK

STATE OF WASHINGTON
SUPERIOR COURT OF WASHINGTON FOR WHITMAN COUNTY

WASHINGTON STATE UNIVERSITY, a
public university,

        Plaintiff,

    v.

FACTORY MUTUAL INSURANCE
COMPANY, a Rhode Island corporation,

        Defendant.

Case No. **21-2-00095-38**

**COMPLAINT**

**JURY DEMAND**

Plaintiff Washington State University ("WSU") brings this action for declaratory relief and damages arising out of defendant Factory Mutual Insurance Company's ("Factory Mutual") wrongful failure to provide plaintiff WSU with the full scope of coverage due under a $300,000,000 per occurrence "ALL RISKS" insurance policy Factory Mutual sold to WSU.

### I. PARTIES

1.    WSU is a public land-grant research university with its main campus in Pullman, Whitman County, Washington, and additional satellite campuses and facilities throughout the state of Washington. WSU is an agency of the state of Washington.

2.    Factory Mutual is a commercial property insurance company incorporated and headquartered in the state of Rhode Island, doing business in Whitman County, Washington.

### II. JURISDICTION AND VENUE

3.    The Court has jurisdiction over Defendant and the subject matter of this litigation

COMPLAINT- 1

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

pursuant to RCW 2.08.010 because the actions giving rise to Plaintiff's claims herein occurred in Whitman County, Washington, and because Defendant advertised, marketed, sold and distributed policies of insurance in Washington to Washington businesses, including the policy of insurance purchased by WSU.

4.      Venue is appropriate pursuant to RCW 4.12, in that the injuries complained of herein occurred and the cause here arose in Whitman County, Washington.

### III. FACTS AND CLAIMS

5.      Plaintiff WSU operates campuses and facilities in Pullman, Spokane, the Tri-Cities in Richland, Vancouver, Everett, and other locations in Washington. WSU has offices in every county of Washington through its extension offices. WSU is a member of the Pac-12 athletic conference.

6.      In the fall of 2019, WSU enrolled a total of more than 31,607 students including over 20,000 students at its Pullman, Washington campus.

7.      WSU employs over 8,000 people, including over 2,000 administrative professionals, over 2,000 classified staff, over 2,500 faculty, and over 1,500 graduate assistants. Over 70% of WSU's employees are full time.

### The Factory Mutual Policy

8.      To protect its business property and income, WSU purchased Non-Assessable Master Global Insuring Policy No. 1043385 (the "Policy") from Factory Mutual for the policy period October 1, 2018 through October 1, 2020. A true and correct copy of the Policy is attached hereto as **Exhibit 1**.

9.      WSU paid, and Factory Mutual accepted, substantial premiums due under the Policy. The Policy is a valid and enforceable contract between WSU and Factory Mutual.

10.     Among other things, the Policy covers real and personal property "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE," unless excluded, with a maximum limit of liability of $300,000,000 per occurrence.

COMPLAINT- 2

11.     The Policy insures WSU for "Time Element" loss "directly resulting from physical loss or damage of the type insured."

12.     The Policy further provides WSU with "communicable disease response" coverage up to $1,000,000 per occurrence and annually in the aggregate. Communicable disease response coverage covers cleanup, removal and disposal costs associated with the "actual not suspected presence of communicable disease."

13.     The Policy further provides WSU with "interruption by communicable disease" coverage up to $1,000,000 per occurrence and in the aggregate.

14.     Under the "Property Damage" portion of the Policy, Factory Mutual further agreed to cover up to $100,000,000 in "Expediting Costs," defined as the "reasonable and necessary costs incurred: 1) for the temporary repair of insured physical damage to insured property; 2) for the temporary replacement of insured equipment suffering insured physical damage; and 3) to expedite the permanent repair or replacement of such damaged property."

15.     As part of the "Time Element Coverages" the Policy further provides coverage for "Extra Expense," defined in part as "reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY… to temporarily continue as nearly normal as practicable the conduct of the Insured's business."

16.     As part of the "Time Element Coverage Extensions," the Policy further provides "Protection and Preservation of Property" coverage for, among other things, "reasonable and necessary costs incurred for action to temporarily protect or preserve insured property; provided such actions are necessary due to the actual, or to prevent immediately impending, insured physical loss or damage to such insured property."

17.     As part of the "Property Damage" coverage section, the Policy covers "Claims Preparation Costs" up to $25,000, plus 50% of recoverable costs in excess of $25,000, for costs incurred by WSU for "reasonable fees payable to [WSU's]: accountants, architects, auditors, engineers, or other professionals" and "the cost of using [WSU's] employees, for producing and

COMPLAINT- 3

certifying any particulars or details contained in [WSU's] books or documents, or such other proofs, information or evidence required by [Factory Mutual] resulting from insured loss payable under this Policy for which [Factory Mutual] has accepted liability."

18.     The Policy covers WSU's campuses, and structures and property at each campus, as scheduled "locations."

19.     All Time Element coverages in the Policy are sub-limited to $10,000,000 in the aggregate, per occurrence.

20.     The Policy does not define "physical loss or damage." Nor does the Policy define "loss" or "damage."

21.     Factory Mutual has stated in previous litigation that the term "'physical loss or damage" when undefined in an "all risks" policy like the Policy is "[a]t best . . . susceptible of more than one reasonable interpretation and is therefore ambiguous and must be construed against the [issuing insurer]." *See* Dkt. 127, Plaintiff Factory Mutual Motion *in Limine* No. 5 RE Physical Loss or Damage, at 3, n.1, *Factory Mut. Ins. Co. as Assignee of Albany Molecular Rsch., Inc. and OSO Biopharmaceuticals Mfg., LLC) v. Fed. Ins. Co.,* No. 1:17-cv-00760-GJF-LF (D.N.M. Nov. 19, 2019), attached hereto as **Exhibit 2**.

22.     In standard American dictionaries "physical" is defined as something "having material existence," or "of or relating to that which is material."

23.     In standard American dictionaries "loss" is defined as the "state of not having something that you had" and "deprivation."

24.     In standard American dictionaries "damage" is defined as "loss or harm from injury to person, property, or reputation…"

25.     The Policy also provides other coverages, terms and conditions that may be relevant to and support coverage for the losses sustained by WSU as described herein.

**The Pandemic**

26.     In December of 2019, a novel coronavirus referred to as SARS-CoV-2 began to

COMPLAINT- 4

spread in China. The World Health Organization (the "WHO") later named the disease caused by

SARS-CoV-2 ("the Covid-19 virus"), "COVID-19."

27.     COVID-19 is a severe infectious disease caused by the Covid-19 virus. COVID-19 can cause serious systemic illness and death.[1] To date, there have been over 159 million confirmed cases of COVID-19 (over 32.4 million of them in the U.S. alone) and over 2.6 million deaths worldwide.[2] Due to pervasive spread and presence of the Covid-19 virus and COVID-19 across the planet, both are presumed to be present or imminently present everywhere.[3]

28.     The existence and/or presence of the Covid-19 virus and COVID-19 is not simply reflected in reported cases or individuals' positive test results. The Centers for Disease Control and Prevention ("CDC") estimates that the number of people in the U.S. who have been infected with the Covid-19 virus is likely to be 10 times higher than the number of reported cases.[4] Additionally, at least 40 percent of people infected with the Covid-19 virus are asymptomatic.[5] COVID-19 also includes a pre-symptomatic incubation period of up to 14 days, during which time infected people can transmit the Covid-19 virus to people, into the air and onto surfaces without having experienced symptoms and without realizing that they are infected.[6]

[1] Tianna Hicklin, *Immune cells for common cold may recognize SARS-COV-2*, NAT. INST. OF HEALTH (Aug. 18, 2020), https://www.nih.gov/news-events/nih-research-matters/immune-cells-common-cold-may-recognize-sars-cov-2 (last visited May 12, 2021).
[2] *Coronavirus Disease 2019 (COVID-19)*, CDC, updated Mar. 20, 2021, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited May 12, 2021); *Europe, Southeast Asia, and Eastern Mediterranean COVID Cases: WHO Coronavirus Disease (COVID-19) Dashboard*, WHO (last updated Mar. 20, 2021), https://covid19.who.int/ (last visited May 12, 2021).
[3] *See, e.g.*, Christopher Ingraham, *At the population level, the coronavirus is almost literally everywhere*, WASH. POST, Apr. 1, 2020, https://www.washingtonpost.com/business/2020/04/01/population-level-coronavirus-is-almost-literally-everywhere/ (last visited May 12, 2021).
[4] Lena H. Sun and Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported*, WASH. POST (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited May 12, 2021).
[5] Ellen Cranley, *40% of people infected with covid-19 are asymptomatic, a new CDC estimate says*, BUS. INSIDER (July 12, 2020), https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7 (last visited May 12, 2021).
[6] *See* WHO, *Coronavirus disease 2019 (COVID-19) Situation Report - 73* (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited May 12, 2021); Minghui Yang , Liang Li , Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, https://doi.org/10.1164/rccm.202006-2136LE (last visited Mar. 12, 2021).

COMPLAINT- 5

29.     Studies have demonstrated that pre-symptomatic individuals have an even greater ability to transmit the Covid-19 virus than other infected people because they carry the greatest "viral load."[7] The National Academy of Sciences has concluded that "the majority of transmission is attributable to people who are not exhibiting symptoms, either because they are still in the pre-symptomatic stage, or the infection is asymptomatic."[8]

30.     On or about January 2020, the United States saw its first documented cases of people infected with the Covid-19 virus and people becoming ill with the disease caused by the virus, known as COVID-19.

31.     As early as February 26, 2020, the CDC advised that COVID-19 was spreading freely without the ability to trace the origin of new infections, also known as community transmission or community spread.

32.     On March 11, 2020, the Director of the World Health Organization ("WHO") declared the rapidly spreading COVID-19 disease a worldwide pandemic ("the Pandemic").

33.     The Covid-19 virus is highly contagious, uniquely resilient, and potentially deadly. The degree to which an infectious disease is contagious is measured by $R^0$, a term that defines how many other people will become infected by one person with that disease. Studies have concluded that one person infected with the Covid-19 virus will infect up to 5.7 others ($R^0 \approx 5.7$), which is much higher than seasonal influenza for example, where on average, one person will infect only 1.3 others ($R^0 \approx 1.3$).[9]

---

[7] *See, e.g.*, Xi He et al., *Temporal dynamics in viral shedding and transmissibility of COVID-19,* 26 NATURE MED. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 (last visited May 12, 2021); Lirong Zou, M.Sc., *et al., SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients,* NEW ENG. J. OF MED. (Mar. 19, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2001737 (last visited May 12, 2021).
[8] Meagan C. Fitzpatrick, Alison P. Galvani, Seyed M. Moghadas, Abhishek Pandey, Pratha Sah, Affan Shoukat, and Burton H. Singer, *The implications of silent transmission for the control of COVID-19 outbreaks,* 117 PNAS 30, 17513-15, July 28, 2020 https://www.pnas.org/content/117/30/17513 (last visited May 12, 2021).
[9] M. Cevik, C.C.G. Bamford, A. Ho, *COVID-19 pandemic-a focused review for clinicians*, 26 CLIN MICROBIOL INFECT. 7, 842-47 (July 2020), https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(20)30231-7/fulltext (last visited May 12, 2021).

COMPLAINT- 6

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

34.     The Covid-19 virus can remain infectious for "much longer time periods than generally considered possible."[10] In the Journal of Virology, researchers demonstrated that the Covid-19 virus can survive up to 28 days at room temperature (68ºF) on a variety of surfaces including glass, steel, vinyl, plastic, and paper.[11] A CDC report from March 27, 2020, stated that the Covid-19 virus was identified on surfaces of the cabins on the Diamond Princess cruise ship 17 days after the cabins were vacated but before they were disinfected.[12] Numerous other scientific studies and articles have identified the persistence of the Covid-19 virus on doorknobs, toilets, faucets and other high-touch points, as well as on commonly overlooked surfaces such as floors.[13]

35.     The WHO states that "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks . . . . People can catch COVID-19 if they breathe in these droplets from a person infected with the virus . . . . These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails. People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."[14]

36.     Early in the course of the spread of the Covid-19 virus, testing was limited, and thus potentially thousands more people were infected than were reported.[15] Using the testing that

---

[10] Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J. 145 (2020), https://doi.org/10.1186/s12985-020-01418-7 (last visited May 12, 2021).

[11] *Id.*

[12] Leah F. Moriarty, Mateusz M. Plucinski, Barbara J. Marston, et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, 69 MMWR 12, 347-352, March 27, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited May 12, 2021).

[13] Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020,* 26 EMERG. INFECT. DIS. 7, 1583-91 (July 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7323510 (last visited May 12, 2021).

[14] *Q&A on coronaviruses (COVID-19)*, World Health Organization, https://web.archive.org/web/20200506094904/https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited May 12, 2021).

[15] *See, e.g.*, Benedict Carey and James Glanz, *Hidden Outbreaks Spread Through U.S. Cities Far Earlier Than Americans Knew, Estimates Say*, N.Y. TIMES (Apr. 23, 2020), (updated July 6, 2020), https://nytimes.com/2020/04/23/us/coronavirus-early-outbreaks-cities.html (last visited May 12, 2021).

---

COMPLAINT- 7

was available at that time, local positivity rates clearly demonstrated the pervasiveness of the Covid-19 virus throughout the counties and areas where WSU's business properties are located.

37.     Epidemiologists have explained that "the percent positive is a critical measure because it gives us an indication of how widespread infection is in the area where the testing is occurring[.]"[16] It is a crucial indicator of whether a business can safely remain open. As a threshold for the percent positive being "too high," the WHO stated that the percent positive should remain below 5 percent for at least two weeks before re-opening.[17]

38.     As of the end of May, 2021, the Centers for Disease Control (the "CDC") reports that over 32,990,000 people have contracted COVID-19 and over 588,000 have died from the disease.[18]

**Properties of the Covid-19 Virus**

39.     The omnipresence of the Covid-19 virus is enabled by multiple modes of viral transmission, including respiratory droplets, airborne and fomite transmission (*i.e.,* transmission from surfaces and objects).[19] These transmission methods demonstrate that the Covid-19 virus causes direct physical loss or damage to property.

40.     In addition to being found in air samples,[20] the Covid-19 virus remains stable in body secretions (respiratory, urine, feces), on surfaces, and in sewage, particularly at lower temperatures.[21]

---

[16] David Dowdy and Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive"*, Johns Hopkins Bloomberg School of Public Health Expert Insights (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html (last visited May 12, 2021).

[17] *Id.*

[18] *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited May 27, 2020).

[19] *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited May 12, 2021).

[20] Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China*, 2020, 26 EMERG. INFECT. DIS. 7, 1583-91 (July 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7323510/ (last visited May 12, 2021).

[21] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential*

COMPLAINT- 8

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

41.     Respiratory transmission of the Covid-19 virus occurs through exposure to an infected person's respiratory particles, such as from saliva or mucus.[22] Respiratory transmission of the Covid-19 virus is commonly divided into droplets (larger particles that have a transmission range of about six feet) and airborne (smaller particles that can remain suspended in the air for prolonged periods of time) modes of transmission. Though convenient, this binary division is an oversimplification that underscores transmission risk.[23] Humans produce a wide range of particle sizes when coughing, sneezing, talking, singing, or otherwise dispersing droplets, with pathogens predominating in the smallest particles.[24] Respiratory particles produced by the average person can travel almost 20 feet by sneezing.[25] An M.I.T. researcher has found that virus-laden "clouds" containing clusters of droplets can travel 23 to 27 feet.[26]

42.     Airborne transmission involves the spread of the infectious agent caused by the dissemination of droplet nuclei (aerosols) from, for example, exhaled breath, that remain infectious when suspended in the air over long distances and time.[27] These tiny particles can remain suspended "for indefinite periods unless removed by air currents or dilution

---

*surrogates*, 92 J. OF MED. VIROLOGY 11, 2498-510 (June 2020), https://doi.org/10.1002/jmv.26170 (last visited May 12, 2021).

[22] *Id.*

[23] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited May 12, 2021).

[24] *Id.*

[25] *Id.*

[26] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18, 1837-38, Mar. 26, 2020, https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited May. 13, 2021).

[27] *Id*; *see also* Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act*, TIME, Aug. 25, 2020, https://time.com/5883081/covid-19-transmitted-aerosols/ (last visited May 13, 2021); Ramon Padilla & Javier Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, (last updated Sept. 21, 2020), www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/ (last visited May 13, 2021); Wenzhao Chen, Nan Zhang, Jianjian Wei, Hui-Ling Yen, and Yuguo Li, *Short-range airborne route dominates exposure of respiratory infection during close contact*, 176 BLDG. AND ENV'T (June 2020), https://www.sciencedirect.com/science/article/pii/S0360132320302183 (last visited May 13, 2021).

COMPLAINT- 9

ventilation."[28] As a result, the risk of disease transmission increases substantially in enclosed environments as compared to outdoor settings.[29]

43.    The WHO and the scientific community have studied the spread of the Covid-19 virus through aerosols in indoor settings via air circulation systems. For example, the CDC published a research letter concluding that a restaurant's air conditioning system triggered the transmission of the Covid-19 virus, spreading it to people who sat at separate tables downstream of the restaurant's airflow.[30] Moreover, a study detected the Covid-19 virus inside the HVAC system connected to hospital rooms of patients sick with COVID-19. The study found the Covid-19 virus in ceiling vent openings, vent exhaust filters and ducts located as much as 56 meters (over 183 feet) from the rooms of the sick COVID-19 patients.[31]

44.    Additionally, the CDC has stated that "there is evidence that under certain conditions, people with COVID-19 seem to have infected others who were more than 6 feet away" and infected people who entered the space shortly after the person with COVID-19 had left.[32] A recently published (February 2021) systematic review of airborne transmission of the Coronavirus corroborated the CDC's concerns and recommended procedures to improve

---

[28] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited May 13, 2021).

[29] Muge Cevik, Julia L Marcus, Caroline Buckee, & Tara C Smith, *Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy*, CLINICAL INFECTIOUS DISEASES (2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa1442/5910315 (last visited May 13, 2021).

[30] Jianyun Lu, Jieni Gu, Kuibiao Li, Conghui Xu, Wenzhe Su, Zhisheng Lai, Deqian Zhou, Chao Yu, Bin Xu, and Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China*, 2020, 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764 article (last visited May 13, 2021); *see also* Keun-Sang Kwon, Jung-Im Park, Young Joon Park, Don-Myung Jung, Ki-Wahn Ryu, and Ju-Hyung Lee, *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea*, 35 J. KOREAN MED. SCI. 46 (Nov. 2020), https://doi.org/10.3346/jkms.2020.35.e415 (last visited May 13, 2021).

[31] Karolina Nissen, Janina Krambrich, Dario Akaberi, Tobe Hoffman, Jiaxin Ling, Ake Lundkvist, Lennart Svensson & Erik Salaneck, *Long-distance airborne dispersal of SARS-CoV-2 in COVID-19 wards*, SCI REP 10, 19589 (Nov. 11, 2020), https://doi.org/10.1038/s41598-020-76442-2 (last visited May 13, 2021).

[32] CDC, *How COVID-19 Spreads* (last updated May 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 13, 2021).

COMPLAINT- 10

ventilation of indoor air environments to decrease bioaerosol concentration and reduce the Coronavirus' spread.[33]

45.     Occupancy of indoor spaces is reported to be a major risk factor for transmission of the Covid-19 virus. Investigation of over 7,000 COVID-19 cases found that all outbreaks involving three or more people occurred indoors.[34] The airborne Covid-19 virus RNA has been detected inside indoor spaces at distances over 50 meters from its source and in outdoor air in crowded areas outside of buildings.[35]

46.     The CDC has recommended "ventilation interventions" to help reduce exposure to the airborne Covid-19 virus in indoor spaces, including increasing airflow and air filtration (such as with high-efficiency particulate air ("HEPA") fan/filtration systems).[36] These and other remedial measures can be implemented, at high cost and extra expense, to reduce the amount of the Covid-19 virus present in the space and to make property safe for its intended use. These extreme measures demonstrate that the Covid-19 virus and COVID-19 cause direct physical loss, damage or destruction to interior spaces. And even then, those interventions, at most, reduce–but do not eliminate–the aerosolized Covid-19 virus in an indoor space.

47.     The Covid-19 virus may also be transmitted to people from physical objects, materials or surfaces. "Fomites" are physical objects or materials that carry, and are capable of transmitting infectious agents, altering these objects to become vectors of disease.[37] Fomite

---

[33] Zahra Noorimotlagh, Neemat Jaafarzadeh, Susana Silva Martínez, & Seyyed Abbas Mirzaee, *A systematic review of possible airborne transmission of the COVID-19 virus (SARS-CoV-2) in the indoor air environment*, 193 ENV'T RSCH. 110612, 1-6 (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0013935120315097?dgcid=rss_sd_all (last visited May 13, 2021).
[34] Hua Qian et al., *Indoor transmission of SARS-CoV-2*, INDOOR AIR (Oct. 31, 2020), https://pubmed.ncbi.nlm.nih.gov/33131151/ (last visited May 12, 2021).
[35] Yuan Liu et al., *Aerodynamic analysis of SARS-CoV-2 in two Wuhan hospitals*, 582 NATURE 7813, 557-60 (June 2020), https://pubmed.ncbi.nlm.nih.gov/32340022/ (last visited May 12, 2021).
[36] CDC, *Ventilation in Buildings* (last updated March 23, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20SARS%2DCoV%2D2 (last visited May 13, 2021).
[37] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/fomite (last visited May 13, 2021).

COMPLAINT- 11

1  transmission has been demonstrated as highly efficient for viruses, both from object-to-hand and

2  from hand-to-mouth.[38]

3  48.     The WHO has described fomite transmission as follows:

Respiratory secretions or droplets expelled by infected individuals can contaminate
surfaces and objects, creating fomites (contaminated surfaces). **Viable SARS-CoV-2
virus and/or RNA detected by RT-PCR can be found on those surfaces for periods
ranging from hours to days**, depending on the ambient environment (including
temperature and humidity) and the type of surface, in particular at high concentration in
health care facilities where COVID-19 patients were being treated. Therefore,
transmission may also occur indirectly through touching surfaces in the immediate
environment or objects contaminated with virus from an infected person . . . .[39] (emphasis
added).

4  49.     In addition to studies cited by the WHO,[40] numerous other studies and scientific

11  articles have discussed fomite transmission as a mode of virus transmission, including, but not

12  limited to:

13  a) A study of a COVID-19 outbreak published by the CDC identifying elevator buttons

14     and restroom taps as possible causes of the "rapid spread of SARS-CoV-2" in a shopping

15     mall in China.[41]

16  b) A National Institutes of Health study published in the New England Journal of

17     Medicine finding that the Covid-19 virus survives up to 4 hours on copper, up to 24 hours

18     on cardboard, and up to 3 days on plastic and stainless steel, and suggesting that people

19     may acquire the virus through the air and after touching contaminated objects.[42] Indeed,

20

21  [38] CDC, Jing Cai, Wenjie Sun, Jianping Huang, Michelle Gamber, Jing Wu, Guiqing He, *Indirect Virus
     Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIONS DISEASES 6 (June
22   2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited May 13, 2021).
     [39] *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020),
23   https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-
     prevention-precautions (last visited May 13, 2021).
24   [40] *Id.*
     [41] CDC, Jing Cai, Wenjie Sun, Jianping Huang, Michelle Gamber, Jing Wu, Guiqing He, *Indirect Virus
25   Transmission in Cluster of COVID-19 Cases*, Wenzhou, China, 2020, 26 EMERGING INFECTIONS DISEASES 6 (June
     2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited May 13, 2021).
26   [42] National Institutes of Health, *New coronavirus stable for hours on surfaces* (May 13, 2020),
     https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited May 13, 2021).

COMPLAINT- 12

another insurance company, Zurich, republished the study on its website and restated the study's conclusion when discussing the fomite transmission of the Covid-19 virus in a workplace.[43]

c) An American Society for Microbiology article discussing fomite infection as involving both porous and non-porous surfaces, and occurring through a fomite's contact with bodily secretions, hands, aerosolized virus from talking, sneezing, coughing, etc., or other airborne viral particles that settle after a disturbance of a fomite (*e.g.*, shaking a contaminated textile such as clothing merchandise).[44] According to the researchers, "[o]nce a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites (if brought together)."[45] Generally, frequently touched surfaces can become highly transmissive fomites.[46]

d) A CDC research letter reporting that the Covid-19 virus can remain viable on polystyrene plastic, aluminum, and glass for 96 hours in indoor living spaces.[47]

e) A *Journal of Hospital Infection* article citing studies revealing that human coronaviruses can persist on inanimate surfaces like metal, glass, or plastic for up to 9 days.[48]

---

[43] RiskTopics, *Cleaning and Disinfecting Plans During COVID-19 Outbreak* (April 2020), https://www.zurich.com/-/media/project/zurich/dotcom/industry-knowledge/covid-19/docs/cleaning-and-disinfecting-during-covid-19-outbreak-rt.pdf?la=en&rev=e3c9d0882ef14be7b77587a4a95749a2 (last visited May 13, 2021).

[44] Stephanie A. Bone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, 73 APPLIED AND ENVIRONMENTAL MICROBIOLOGY 6, 1687-96 (Mar. 2007) https://aem.asm.org/content/73/6/1687 (last visited May 13, 2021).

[45] *Id.*

[46] *Id.*

[47] CDC, Boris Pastorino, Franck Touret, Magali Gilles, Xavier de Lamballerie, and Rémi N. Charrel, *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 EMERGING INFECTIOUS DISEASES 9 (Sept. 2020), https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article (last visited May 13, 2021).

[48] G. Kampf, D. Todt, S. Pfaender, E. Steinmann, *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. OF HOSPITAL INFECTION 104, 246-51 (2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last visited May 13, 2021).

COMPLAINT- 13

50.     Importantly, the Covid-19 virus has been detected on environmental objects and surfaces from symptomatic, pre-symptomatic, and asymptomatic individuals.[49] Fomites transform the surface of property into a potentially deadly transmission device. A study published in the Journal of Epidemiology and Infection demonstrated that after lockdown in the United Kingdom, Covid-19 virus transmission via fomites may have contributed to as many as 25 percent of deaths in that region.[50]

51.     Accordingly, the presence of the Covid-19 virus in and on property, including in indoor air, on surfaces, and on objects, causes direct physical loss or damage to property by causing physical harm to and altering property and otherwise making physical property incapable of being used for its intended purpose.

52.     Among other things, the presence of the Covid-19 virus transforms everyday surfaces and objects into fomites, causing a tangible change of the property into a transmission vehicle for disease from one host to another. The WHO's description of fomite transmission of the virus expressly recognizes this physical alteration of property, describing viral droplets as "*creating* fomites (contaminated surfaces)"[51] (emphasis added). "Creating" involves making or bringing into existence something new[52]–such as something that is in an altered state from what it was before the Covid-19 virus was present on, in, and around the property.

---

[49] *See* WHO, *Coronavirus disease 2019 (COVID-19) Situation Report - 73* (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited Mar. 20, 2021); Minghui Yang , Liang Li , Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, https://doi.org/10.1164/rccm.202006-2136LE (last visited May 13, 2021).
[50] A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms: a mathematical analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (Oct. 2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-of-covid19-transmission-including-indirect-transmission-mechanisms-a-mathematical-analysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited May 13, 2021).
[51] *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Mar. 20, 2021) (last visited May 13, 2021).
[52] *See, e.g.*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/create (last visited May 13, 2021).

COMPLAINT- 14

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

53.     The Covid-19 virus adheres to surfaces and objects, harming and physically changing and physically altering those objects by becoming a part of their surface and making physical contact with them unsafe for their ordinary and customary use. Once the Covid-19 virus is in, on, or near property, it is easily spread by the air, people, and objects, from one area to another, causing additional direct physical loss or damage.

54.     Additionally, the presence of the dangerous and potentially fatal Covid-19 virus in and on property, including in indoor air, on surfaces, and on objects, renders the property lost, unsafe, and unfit for its normal usage. Respiratory particles (including droplets and airborne aerosols) and fomites are physical substances that alter the physical properties of the interiors of buildings to make them unsafe, untenable, and uninhabitable.

55.     In addition to being found in air samples,[53] the Covid-19 virus remains stable in body secretions (respiratory, urine, feces), on surfaces, and in sewage, particularly at lower temperatures.[54]

### The Covid-19 Virus Cannot be Eliminated
### from Property by Routine Cleaning

56.     A number of studies have demonstrated that the Covid-19 virus is "much more resilient to cleaning than other respiratory viruses so tested."[55] The measures that must be taken to remove the Covid-19 virus from property are significant, and far beyond ordinary or routine cleaning.

57.     The efficacy of decontaminating agents for viruses is based on a number of factors, including the initial amount of virus present, contact time with the decontaminating

---

[53] Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China*, 2020, 26 EMERG. INFECT. DIS. 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited May 12, 2021).
[54] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. OF MED. VIROLOGY 11, 2498-510 (June 2020), https://doi.org/10.1002/jmv.26170 (last visited May 12, 2021).
[55] *Id*.

COMPLAINT- 15

agent, dilution, temperature, and pH, among many others. Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions.[56]

58.    Additionally, it can be challenging to accurately determine the efficacy of decontaminating agents. The toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[57]

59.    In order to be effective, cleaning and decontamination procedures require strict adherence to protocols not necessarily tested under "real life" or practical conditions, where treated surfaces or objects may not undergo even exposure or adequate contact time.[58] Studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70 percent alcohol.[59]

60.    When considering disinfection and decontamination, the safety of products and procedures must be considered as well, due to the risks of harmful chemical accumulation, breakdown of treated materials, flammability, and potential for allergen exposure.[60]

61.    Studies have demonstrated that the Covid-19 virus can survive on fabrics and be transferred to skin and other surfaces, "suggesting it is biologically plausible that . . . infectious diseases can be transmitted directly through contact with contaminated textiles."[61] Given the inadequacy of conventional cleaning procedures, disinfection and decontamination measures include, but are not limited to, the use of harsh chemicals to perform deep disinfection, the removal and disposal of porous materials like clothing, cloth and other fabrics, and making

---

[56] Id.
[57] Id.
[58] Id.
[59] Joon Young Song, Hee Jin Cheong, Min Joo Choi, Ji Ho Jeon, Seong Hee Kang, Eun Ju Jeong, Jin Gu Yoon, Saem Na Lee, Sung Ran Kim, Ji Yun Noh, & Woo Joo Kim, *Viral Shedding* and *Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 252-5 (2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited May 13, 2021).
[60] Id.
[61] Lucy Owen and Katie Laird, *The role of textiles as fomites in the healthcare environment: a review of the infection control risk*, 8 PEER J. LIFE AND ENV'T e9790, 1-35 (2020), https://peerj.com/articles/9790/ (last visited May 13, 2021).

COMPLAINT- 16

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

changes to air filtration systems, and redesigning interior spaces, all performed at great cost and expense to property owners. These measures, among others, demonstrate that the Covid-19 virus causes physical loss or damage to property.

62.    Many of the surfaces and materials discussed in the studies and articles cited above are used throughout WSU's operations, including plastics, glass, metals, and cloth and fabrics such as upholstery.

63.    Moreover, the aerosolized Covid-19 virus particles cannot be eliminated by routine cleaning. Cleaning surfaces in an indoor space will not remove the aerosolized Covid-19 virus particles from the air that people can inhale and become infected with the Covid-19 virus–no more than cleaning friable asbestos particles that have landed on a surface from that surface will remove the friable asbestos particles suspended in the air that people can inhale and develop asbestos-related diseases.

64.    Moreover, given the ubiquity and pervasiveness of the Covid-19 virus, no amount of cleaning or ventilation intervention will prevent a person infected and contagious with the Covid-19 virus from entering an indoor space and exhaling millions of additional Covid-19 virus particles into the air, further: (a) filling the air with the aerosolized Covid-19 virus that can be inhaled, sometimes with deadly consequences; and (b) depositing Covid-19 virus particles on the surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

### The Pandemic in Washington

65.    In January of 2020, health officials reported that a resident of the state of Washington about 30 miles north of Seattle became the first-known U.S. resident infected by the virus. The first reported COVID-19 death in the United States occurred in King County, Washington, on or around February 28, 2020.

66.    Washington experienced an exceptionally high positivity rate: as of March 31, 2020, Washington had a 7-day moving positivity average rate of 9.3%.[62] Washington's positivity

---

[62] *Daily State-By-State- Testing Trends*, JOHNS HOPKINS UNIV.MED. (last updated June 28, 2021),

COMPLAINT- 17

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

rate remained consistently over 5 percent until dropping below this figure in February 2021, demonstrating the need for continuing health and safety measures.[63]

67.    The Washington Department of Health reported over 398,000 confirmed cases and over 5,700 deaths in Washington State as of the end of May, 2021.[64]

68.    The economic impact of the Pandemic has also been staggering. The unemployment rate in Washington more than tripled from 5.1 percent before the Pandemic to 15.4 percent in April 2020.[65] Washington is also expected to suffer substantial revenue declines as a result of COVID-19's impact on Washington's economy. Washington's budget shortfall is projected at $1 billion per year for 2020, 2021, and 2022.[66]

69.    Every county where WSU has insured locations has reported positive tests for infection by the Covid-19 virus.

70.    The first confirmed case of COVID-19 in Whitman County, Washington was reported on March 22, 2020. By March 27, 2020, there were five confirmed positive test results in Whitman County.

71.    The presence of the Covid-19 virus at WSU's insured properties, in March 2020 and thereafter, was statistically certain or near-certain, using statistical modeling based on the known incidences of infection and other information generally used in epidemiology, despite the lack of commercially available tests for fomite or the aerosolized Covid-19 virus, and despite the shortage of tests that could have otherwise been administered to every individual who was on-site at the relevant times.[67]

---

https://coronavirus.jhu.edu/testing/individual-states/washington (last visited June 30, 2021).
[63] *COVID-19 Data Dashboard*, Washington Department of Health (updated May 8, 2021), https://www.doh.wa.gov/Emergencies/COVID19/DataDashboard (last visited May 12, 2021).
[64] *See* Washington State Department of Health COVID-19 Data Dashboard, https://www.doh.wa.gov/Emergencies/COVID19/DataDashboard (last visited May 27, 2020).
[65] Jim Camden, *Washington lost a half-million jobs in April; unemployment reaches 15%*, The Spokesman-Review (May 20, 2020) (last visited May 12, 2021).
[66] *State Budget Watch*, Center on Budget and Policy Priorities (Nov. 6, 2020), https://www.cbpp.org/research/statebudget-and-tax/states-grappling-with-hit-to-tax-collections (last visited May 12, 2021).
[67] *See, e.g.*, Aroon Chande, Seolha Lee, Mallory Harris, Quan Nguyen, Stephen J. Beckett, Troy Hilley, Clio Andris,

COMPLAINT- 18

1

**Governmental Orders Addressing the Pandemic**

2    72.    Local, state, and federal government officials issued a series of orders in an effort

3    to stop or slow the transmission of the Covid-19 virus via person-to-person and property-to-

4    person transmission.

5    73.    On February 29, 2020, Washington State Governor Jay Inslee issued

6    Proclamation 20-05, proclaiming that a State of Emergency existed in all Washington counties

7    due to the rapid transmission of COVID-19 between Washington residents.

8    74.    On March 1, 2020, King County, Washington Executive Dow Constantine

9    proclaimed a state of emergency in King County, Washington due to COVID-19.

10    75.    On March 3, 2020, City of Seattle Mayor Jenny A. Durkan issued a "Mayoral

11    Proclamation of Civil Emergency" due to COVID-19.

12    76.    On March 11, 2020, Governor Inslee issued Proclamation 20-07, which among

13    other things, amended Proclamation 20-05, and established "community mitigation strategies"

14    due to COVID-19, including prohibiting gatherings of 250 people or more for specified

15    activities, including "recreational activities."

16    77.    On March 16, 2020, Governor Inslee issued Proclamation 20-13, which

17    prohibited in-person dining in restaurants and stated that COVID-19 "remains a public disaster

18    affecting life, health, [and] property."

19    78.    Through Proclamation 20-13, Governor Inslee ordered restaurants to suspend

20    dine-in food and beverage service, stating:

21    ". . . COVID-19 remains a public disaster affecting life, health, [and] property. I hereby
         prohibit the onsite consumption of food and/or beverages in a public venue . . . including

22    . . . restaurants.

23                                            * * *

24

25

26    & Joshua S. Weitz, *Real-time, interactive website for US-county-level COVID-19 event risk assessment*, 4 NAT.
      HUMAN BEHAVIOR, 1313-19 (Nov. 9, 2020), https://doi.org/10.1038/s41562-020-01000-9 (last visited May 12, 2021).

COMPLAINT- 19

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

1
2

This Proclamation does not apply to a broad range of businesses and services, including but not limited to grocery stores, pharmacies . . ."

3   79.   On March 23, 2020, Governor Inslee issued Proclamation 20-25, known as the

4   "Stay Home—Stay Healthy Order," prohibiting Washington residents from leaving their homes

5   except for essential functions such as getting groceries and seeking medical care. Governor

6   Inslee's Proclamation 20-25 also ordered that all non-essential businesses in Washington State

7   cease performing all but "minimum basic operations" necessary to "maintain the value of the

8   business' inventory, preserve the condition of the business' physical plant and equipment, [and]

9   ensure security," among other things.

10   80.   On April 2, 2020, Governor Inslee issued Proclamation 20-25.1, which, among

11   other things, extended Proclamation 20-25's restrictions to at least May 4, 2020. On May 4,

12   2020, Governor Inslee extended Proclamations 20-25 and 20-25.1 through May 31, 2020.

13   81.   Similar orders were issued by county officials in many of the counties in

14   Washington in which WSU conducts operations.

15   82.   The above orders, and other governmental orders and proclamations, while

16   appropriate and necessary measures to fulfill the Governor's obligation to protect the health of

17   the public, impacted WSU's ability to serve its students, employees and communities, by

18   prohibiting or limiting the use of insured property, designating such property unsafe, requiring

19   alterations to physical property, and dispossessing WSU of its physical property.

20   **The Losses Due to the Impact of the Pandemic, the Covid-19 Virus and the Orders on**
21   **WSU's Insured Locations, Its Operations, and Its Expenditures Trigger Coverage Under**
     **WSU's All-Risks Policy**
22

23   83.   The Pandemic described above is a natural disaster.

24   84.   WSU's insured locations include numerous buildings with common areas in

25   which large numbers of people congregate or pass through.

26

COMPLAINT- 20

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

85.    Not surprisingly, due to the large number of its students and employees, the large number of visitors to its multiple campuses, and the mobility of its students and employees through areas of the country that had high infection rates, many employees, vendors, and students that have been on WSU's insured locations since the beginning of the Pandemic have confirmed that they were infected with the Covid-19 virus while on WSU's insured properties.

86.    Given the high percentage of persons infected by the Covid-19 virus who are asymptomatic, it is certain or near-certain that the actual number of WSU employees or students infected with the Covid-19 virus that have been on WSU's insured locations since the beginning of the Pandemic is substantially greater than the number of employees, vendors, and students known to have been infected with the Covid-19 virus.

87.    In light of the number of employees, vendors, and students present at WSU's insured locations on a regular basis, how highly contagious the Covid-19 virus is, the reported rate of infection throughout the state of Washington, including in the vicinity of the insured locations, what is known about the reported rate of infection substantially undercounting the actual rate of infection in the early months of the Pandemic, and other factors, it is statistically certain or near-certain that Covid-19 was actually present in each of WSU's insured locations beginning in early March, 2020.

88.    The impact of the Pandemic described above on WSU's operations was immediate and dramatic.

89.    The Pandemic made it necessary for WSU to suspend operations, incur extra expense, and to undertake costly efforts to protect and preserve property from further damage or loss including making physical alterations to its property.

90.    Examples of WSU's early suspension of its operations include the following: on March 11, 2020, WSU announced that all in-person instruction would end effective March 23, 2020 and implemented "remote learning" through the remainder of the spring semester; on March 17, 2020, Dining Services modified the availability of food options at its facilities to

COMPLAINT- 21

delivery and to-go only, ending in-person dining; on March 17, 2020 summer education abroad programs were canceled and program fees were refunded; on March 22, 2020, all libraries on the Pullman campus were closed.

91.    Services, events, and other aspects of WSU's operations that could not be conducted remotely were suspended completely, including sporting events.

92.    The suspension of in-person instruction resulted in students staying home to attend school rather than returning to WSU's student housing, among other impacts.

93.    The suspension of operations caused significant "Time Element" business income loss through the loss of tuition fees, room and board payments, ticket sales to sporting and other cultural and educational events, food and beverage sales, and other income generated by the operations of WSU's locations.

94.    In addition, due to the physical loss or damage described above, WSU was required to make physical changes to its locations, and purchase and alter business personal property, to prevent further physical loss or damage, to minimize the suspension of WSU's operations, and to preserve and protect WSU's property.

95.    Examples of such expenditures include but are not limited to: frequent testing of staff and students; enhanced attempts to maintain sanitization of surfaces; investments in technology to enable distance learning; investments to add physical barriers; investments to change air flow and ventilation in covered buildings; and other investments to alter WSU's properties to mitigate the impact of the Pandemic on regular operations.

96.    WSU has or will incur additional costs, covered as Claims Preparation Costs under the Policy, to calculate its losses as a result of the physical loss or damage to insured locations.

97.    The presence of the Covid-19 virus in, on and around insured locations caused direct physical loss or damage to WSU's property, leading to the necessary suspension of

COMPLAINT- 22

operations at insured locations, which has resulted in business income loss and other loss covered by the Policy's Time Element coverage.

98.    And or in the alternative, the governmental orders specifically referred to above, and others, made portions of WSU's insured locations unusable, inaccessible, and devoid of functionality; limited the use of all or portions of the insured locations by requiring social distancing and other measures; dispossessed WSU of its insured property; and required the physical alteration of insured locations to comply with various requirements of the orders, causing physical loss or damage to WSU's insured locations under the Policy and resulting in business income loss and other loss covered by the Policy's Time Element coverage.

99.    And or in the additional alternative, the orders constitute an order of civil authority that limits, restricts or prohibits partial or total access to an insured location as a direct result of physical damage to an insured location or within five statute miles of it, triggering coverage under the Policy's "Civil or Military Authority" extension of time-element coverage.

100.    In addition, the physical loss or damage described above and the impacts of that physical loss or damage on WSU's business income potentially triggers multiple other Time Element coverages under the Policy, including without limitation "Delay in Startup;" "Protection and Preservation of Property Time Element;" and "Research and Development."

101.    In addition, the physical loss or damage described above and the impacts of that physical loss or damage on WSU, including expenditures undertaken by WSU due to the Pandemic, triggers multiple coverages under the Policy including without limitation the following coverages listed under "Property Damage:" "Claims Preparation Cost;" "Expediting Costs;" "Law and Ordinance;" and "Protection and Preservation of Property."

**WSU's Insurance Claim**

102.    WSU timely tendered a claim to Factory Mutual under the Policy.

103.    WSU provided all information reasonably requested by Factory Mutual's assigned adjuster.

COMPLAINT- 23

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

104.    Factory Mutual immediately attempted to limit its inquiry and coverage investigation to the Policy's "Interruption by Communicable Disease" coverage.

105.    Factory Mutual adopted an interpretation of the "Interruption by Communicable Disease" coverage that excluded evidence other than documentary medical proof that someone on the insured premises was infected by the Covid-19 virus and/or suffered from the COVID-19 disease.

106.    Eventually, upon being provided proof that one or more individuals on WSU's insured properties had tested positive and that the individual(s) had been on WSU's insured properties when they were infected, and proof of suspension of operations and resulting losses, Defendant concluded that the "Interruption by Communicable Disease" coverage had been triggered and paid the sub-limited amount under that coverage.

107.    WSU consistently communicated to Factory Mutual that it believed that additional coverage was implicated by the claim, and that WSU's claim was not limited to the "Interruption by Communicable Disease" coverage.

108.    However, Factory Mutual denied any additional coverage whatsoever under the Policy, based on a self-serving interpretation of policy terms including "direct physical loss or damage," and the "contamination exclusion" in the Policy.

109.    On information and belief, Factory Mutual's adjuster was following "Talking Points" that had been distributed company-wide instructing Factory Mutual's employees to deny coverage for any loss arising out of the Pandemic other than "Interruption by Communicable Disease" and/or cleaning coverage triggered by "actual not suspected" presence of the virus, and then only if the insured presented written medical evidence that an employee or customer had tested positive, despite a) the lack of testing available during the beginning of the Pandemic; b) the fact that the Policy does not define "actual not suspected" in such narrow terms; c) the fact that Factual Mutual had previously, when it was to its financial advantage, adopted an interpretation of "direct physical loss or damage" under which the governmental orders specified

COMPLAINT- 24

above would have triggered the Policy; d) the fact that the Policy does not define the phrase "direct physical loss or damage;" e) the fact that the Policy contemplates that "communicable disease" can cause "loss or damage;" and f) the fact that the "contamination exclusion" is at most ambiguous in light of the communicable disease coverage provided by the Policy and for other reasons.

110.    At no point did Defendant interview or request to interview any WSU employee or officer, visit WSU's insured locations, or enter into a good faith negotiation over the potential for coverage under the Policy beyond the "Interruption by Communicable Disease" coverage.

111.    Factory Mutual also unreasonably ignored or failed to change its position upon being informed of Washington court decisions rejecting Factory Mutual's interpretations of certain phrases or terms in the Policy.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION: BREACH OF CONTRACT

112.    WSU realleges and incorporates by reference the allegations in each paragraph above, as if fully set forth herein.

113.    WSU paid substantial premiums to Factory Mutual in consideration for Factory Mutual's promise to pay WSU's claims for business income loss and other losses covered by the Policy. The Policy constitutes a contract between the parties.

114.    WSU complied with all conditions to coverage under the Policy with regard to the losses claimed herein, excepting any that were waived or excused.

115.    Factory Mutual breached its express and implied duties under the Policy by, among other things, denying coverage under the Policy for the losses claimed by WSU herein.

116.    As a result of Factory Mutual's breach of the Policy, WSU has been damaged in an amount to be proved at trial, but not less than $63,068,573, subject as appropriate to the sub-limits of coverage as provided in the Policy.

COMPLAINT- 25

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

1

**SECOND CAUSE OF ACTION: COMMON LAW BAD FAITH**

2    117.    WSU realleges and incorporates by reference the allegations in each paragraph

3    above, as if fully set forth herein.

4    118.    Factory Mutual owes a duty of good faith and fair dealing to WSU.

5    119.    Factory Mutual committed bad faith through multiple acts and omissions,

6    including but not limited to: failing to conduct a reasonable investigation; unreasonably failing to

7    connect the controlling law and language of the Policy to the facts of the loss; failing to put

8    WSU's interests on a par with its own and unreasonably denying WSU insurance benefits.

9    Factory Mutual's unreasonable acts and omissions constitute bad faith under Washington law.

10    120.    Factory Mutual's bad faith acts and omissions directly and proximately caused

11    (and continue to cause) WSU to suffer damages in an amount to be proven at trial. These

12    include, but are not limited to, the deprivation of benefits owed to WSU under the Policy and the

13    costs associated with bringing this action for coverage, including court costs and attorney fees.

14    **THIRD CAUSE OF ACTION: CONSUMER PROTECTION ACT VIOLATIONS**

15    121.    WSU realleges and incorporates by reference the allegations in each paragraph

16    above as if fully alleged herein.

17    122.    Factory Mutual's acts and omissions as described above violated multiple

18    provisions of WAC 284-30-330 including, but not limited to, subsections (4), (7) and (13); such

19    violations are *per se* violations of RCW 19.86, Washington's Consumer Protection Act (the

20    "CPA").

21    123.    Factory Mutual's acts and omissions, as pled above, also constitute non *per se*

22    violations of the CPA because such unreasonable acts and omissions were unfair or deceptive,

23    occurred in trade or commerce, and affected Washington's policyholders and the public interest.

24    124.    Such unfair or deceptive acts or omissions directly and proximately caused and

25    continue to cause WSU to suffer damages in an amount to be proven at trial. These damages

26    include, but are not limited to, the deprivation of benefits owed to WSU under the Policy and the

COMPLAINT- 26

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

1    costs associated with bringing this action for coverage, including court costs and attorney fees.

2    125.    As a result, WSU is entitled to recovery of its actual damages, attorney fees,

3    litigation costs, and treble damages up to $25,000, pursuant to RCW 19.86.090.

4    **FOURTH CAUSE OF ACTION: DECLARATORY JUDGMENT**

5    126.    WSU realleges and incorporates by reference the allegations in each paragraph

6    above as if fully alleged herein.

7    127.    This is a cause of action for declaratory judgment pursuant to the Uniform

8    Declaratory Judgment Act, RCW 7.24.010 *et seq.,* which allows this Court to declare the rights,

9    duties and other legal relations of the parties to this dispute.

10    128.    An actual and justiciable controversy has arisen between WSU and Factory

11    Mutual as to their respective rights and duties under the Policy. Resolution of the dispute over

12    the parties' respective rights and duties under the Policy is necessary.

13    129.    WSU alleges and contends that it is entitled to insurance coverage under the

14    Policy, including under one or more of the coverages provided by the Policy, in addition to the

15    Interruption by Communicable Disease coverage.

16    130.    Factory Mutual contends that there is no coverage for WSU's losses under any of

17    the coverages listed above other than the Interruption by Communicable Disease coverage.

18    131.    WSU seeks a declaratory judgment declaring that 1) Factory Mutual has breached

19    the Policy; 2) that WSU's losses described above are covered under the coverages listed above;

20    and 3) that Factory Mutual is responsible for full and timely adjustment and payment of WSU's

21    losses described above pursuant to the Policy.

22    **Reservation to Amend to Assert IFCA Claim as Cause of Action**

23    132.    WSU intends to give notice to Factory Mutual pursuant to RCW 48.30.015(8). In

24    the event Defendant fails to resolve WSU's claims within the statutory period, WSU reserves the

25    right to amend this Complaint to assert claims under Washington's Insurance Fair Conduct Act

26    ("IFCA").

COMPLAINT- 27

**Miller Nash LLP**
Pier 70 | 2801 Alaskan Way | Suite 300
Seattle, WA  98121-1128
206.624.8300 | Fax: 206.340.9599

# V. PRAYER FOR RELIEF

WHEREFORE, WSU requests the following relief:

1.     For damages in an amount to be proven at trial, but not less than $63,068,573, subject as appropriate to the sub-limits of coverage as provided in the Policy;

2.     For declaratory relief as pled above;

3.     For an award of attorney fees, expert costs, and other costs incurred in bringing this action;

4.     For prejudgment interest accruing until the date judgment is entered, plus post-judgment interest at the statutory rate;

5.     For treble damages under the Consumer Protection Act up to the statutory maximum; and

6.     For such other further relief as the Court deems equitable, just and proper.

DATED:  July 2, 2021

MILLER NASH LLP

_Seth H. Row_

Seth H. Row, WSBA No. 32905

_K. Michael Fandel_

K. Michael Fandel, WSBA No. 16281

Pier 70 – 2801 Alaskan Way, Suite 300
Seattle, Washington  98121
Tel: 206.624.8300
Fax: 206.340.9599
Email:    Seth.Row@millernash.com
          Michael.Fandel@millernash.com

Attorneys for Plaintiff
Washington State University

4821-5848-4720.5

COMPLAINT- 28